an oral argument, would you please step forward to the podium and introduce yourselves. Please call the case. Those who are orally arguing, please step up and introduce yourselves. Good morning, Your Honors. I am Assistant State's Attorney Mary Needham, N-E-E-D-H-A-N, and I will be arguing, responding to the defendant's argument regarding the third post-conviction petition. And good morning, Your Honors. Assistant State's Attorney Alan Spellberg, and I'll be responding to the arguments regarding the constitutionality of the petitioner's actual life sentence. Okay, very well. Welcome to our court. We would appreciate all the briefing that was filed in this matter. Be assured that the justices have fully read your briefs. Both sides will be given 15 minutes for oral argument. So, appellant, when you wish to have rebuttal, save some time from your 15 minutes. Yes, Your Honor, thank you. I would Three. Three. Okay, I'll do my best to try to tap my finger when that happens. I'll put my watch here to do that, too. Thank you. Mr. Sklar, you may proceed. May it please the Court. I've represented Carl Williams since 2006 on a pro bono basis, and I've been concerned over these many years with the difficult time he's had both before my representation and since that time. I feel that he is entitled to a full hearing on his issues that he's presented, and I'm hopeful that at the end of this Court's deliberations they will order a third stage hearing in his post-conviction proceedings. In June of 2009, this Court, in a unanimous opinion, reversed the trial court's dismissal of Mr. Williams' third post-conviction petition, the same petition that's before Your Honors. The Court found that Mr. Williams submitted newly found evidence that was non-cumulative, material, and of such conclusive character as to likely result in a different result but a retrial. The case was sent back to the trial court, a new judge was appointed, and the Court below proceeded as follows. First of all, it never made the required inquiries at the second stage. Secondly, it rather erroneously found that the petitioner's evidence supporting his claims was not newly found, newly discovered. Counsel, can I interrupt you? I'm sorry. In the ruling by Justice Gallagher, in the case you're referring to, in the conclusion of that ruling, doesn't Justice Gallagher say this case is remanded for a second stage proceeding? That's correct, Your Honor. I think that was an appropriate statement. That's an appropriate statement, of course. So it should have gone back for a second stage proceeding. That's correct, Your Honor. Isn't that what the defendant got? No, the defendant never got a second stage proceeding because the Court below never considered whether or not the defendant had made a showing of substantial constitutional violations. Rather, the Court simply went off on the theory that the defendant's prior to his trial had failed to exercise diligence, and therefore his evidence, which is clearly new based on the facts, was technically not new. Again, on a procedure, though, on a second stage, the State can file a motion to dismiss, correct? Yes, they're entitled to do so. That's what happened in this case. That's what happened in this case. Do you think there's any conflict between the language of the Court sending it back for a second stage versus the other rulings of the Court in that case? No, I think that what the Court decided with respect to the substance of its ruling, that is to say that there was such conclusive evidence as to likely result in a different result at retrial, I think that's something that the Court below the trial court should have considered or remanded, at least given deference to the Court of Appeals, in that regard in reaching her opinion. She never got there. The Court below never got there, and we think that's a fault of the trial court. As a precautionary matter, when our third petition was dismissed below, we also filed a fourth petition seeking to have William's sentence reviewed and an evidentiary hearing held so that he could be resentenced. The facts are pretty straightforward. I'm not going to go over them. They're outlined many times in the briefs that have been filed and in the prior opinions. What is important about the facts, though, are what the affiants have said. The affiants have described the fifth offender in this crime of multiple offenders as someone who could not possibly be the defendant of Petitioner Carl Williams. They've also said they told that to the police at the time of their arrest, and they said that they told the police, when showed a Polaroid photograph of Mr. Williams after his arrest, that the police had arrested the wrong person. Secondly, and it took a long time to get that information out of Mr. Williams' co-defendants, he tried for several years, and it was not until 2003, approximately six or seven years after his trial, that he was able to get that information out of the co-defendants. Additionally, it took over 11 years to find the informant who fingered Mr. Williams, Clinton Taylor, alias Larry McGee, who told the police, according to his affidavit, that yes, he would show them to the only Carl that he knew, and that he had no idea that Carl was involved in any crime. Well, that was known, though, to the trial court after the trial, right? So before, perhaps even before sentencing, the trial court was advised that they couldn't find Mr. McGee because it was a fictitious name. He was aware of it. This court commented on that in the first appeal, right? Yes, that is correct, Your Honor. And then in his second post-conviction petition, the defendant brought up the affidavits of his two co-offenders. He didn't have Taylor's yet, but he had his two co-offenders. And the trial court down below in that case, and this court considered those affidavits at that time, affirming the dismissal of his second petition, right? Well, she did not discuss, the trial court below did not discuss. I'm not talking about Angie Patron. I'm talking about, it would have been Vince Glenn back then. So this court in 04 does an appeal, right? That's correct, Your Honor. Second post-conviction petition. That's correct, Your Honor. It's denied, dismissed. It goes up on appeal, and this court considered that in the 04 case coming down on March 31st of 06, where we considered the defendant's affidavits of his two co-offenders, right? Yes, Your Honor, that's correct. But the court at that time- So what's different then? In all due respect, Justice Quinn, what is different is that in the 2006 opinion that this court offered, they made that decision not only on their weighing of the affidavits, but also on the fact that Larry McGee supposedly identified the defendant to the police, and subsequently we found through his affidavit and through talking with Larry McGee, Clinton Taylor, that he did not identify the defendant. So one of the- Well, he did identify the defendant, just as being a Carl who lived in the general area where the real Carl was. He identified a person as Carl, but he did not identify Carl as a person who participated in the crime. Right, but going back, I mean, yourself, in your brief at page 2, you say, based on that McGee statement, McGee told the police that he knew a Carl and would show the police where to find him. Based on that and nothing else, 17-year-old Carl Williams was arrested the next morning, January 14th, without a warrant. So you acknowledge in your own brief that it's strictly McGee that's fingering your client. So the motion suppressed depends on the statements made by McGee, and not at all on the co-defendants, right? Whether there was probable cause to arrest Carl, your Carl, as opposed to the real Carl, depended only on McGee, because the other fellows, the co-defendants couldn't say, that's not Carl, until they're shown a photograph, which was taken when Carl, your client, was picked up. That's correct, Your Honor. Okay. So again, so what was different in the second set of affidavits? Understanding, and I can agree with you, let's assume that you're right on your legal argument that this court was wrong in 2000, on the 2004 appeal, that for whatever reason, that division missed it, missed the call. How can we go back to that when this court held in 2006? Well, we consider the affidavits that are not good enough. What's new? I would suggest, Your Honor, that it's very interesting that Justice Michael Gallagher wrote both opinions, both the 2006 opinion and the 2009 opinion. He's required to. We have a rule on that. Well, and he obviously came to a different conclusion in 2009 than he did in 2006. So I would suggest to Your Honor that there in itself lies a basis for going forward and setting the 2006 opinion aside and looking at the facts as they are now. Well, again, if you've read it, you're more familiar with it than I am, I'm sure. But in the 2009, we set the old war horse, and it's significant. Fundamental fairness requires that this fellow have an attorney acting pro se at the time. And that's, as you point out in your reply brief, that's what has to be done. You know, there's no way Justice Gallagher could say, set it down for a third stage. He can only do, as Justice Connors pointed out, set it down for a second stage. And that's what occurred, right? Yes.  Can you go to the sentencing? I don't want to cut you off either on your argument about the facts, because obviously you know the facts very well. I'd suggest so do we. The sentencing is a fascinating argument. I'm sorry, Your Honor, could you repeat that? The sentencing issue, Miller, is fascinating. Yes. Yes. If you'd like to go to that, I'm prepared to go to that immediately. If you could. Unless you have something else. Do you want to wrap it up here? No, no, no. I think the briefs have made our points very well. It's a very well-written brief. Thank you, Your Honor. And I know I speak for the Court. We discussed this before we came out. There's no higher thing, a calling, than to do pro bono work. And honestly, even on behalf of people charged with murder, they need the best representation possible. And we so rarely see it. It's just, it's really heartening. I'm sure we would both join with Justice Quinn in that remark. By the way, both of you have filed motions for additional authority. All of those motions have been allowed. Thank you, Your Honor. Proceed, sir. One last point before I go on to talk about Miller versus Alabama and Jackson versus Hobbs, and that is based upon the motions which Your Honor allowed for filing additional authority. I did want to point out that with respect to the finding of the court below that there was no diligence, that under People versus Molstead, because the Williams co-defendants were at the time either on trial, defending themselves, facing sentences, or taking appeals, that their rights against self-incrimination would excuse Williams from making inquiry of them at that time. But Molstead also stands to the proposition that the facts are different in Molstead. That co-defendant came forward prior to sentencing, after trial, but prior to sentencing of Mr. Molstead, did he not? That's correct, Your Honor. And the Supreme Court commented that's one reason you could believe that the co-defendant was credible was he came forward because he still hadn't been sentenced either. That's correct, Your Honor. And in our case, all these people's appeals have been over for many, many years. Is that right? That's also correct, Your Honor. But by the same token, getting into the credibility issue, which obviously I hope is reserved for a third stage hearing rather than this morning, the co-defendants here resisted for many, many years, and in fact, had no reason to come forward and help Williams at all. So they got nothing out of this. There's no benefit. It's not going to change their sentence. They're all put away for life. So I think that the fundamental is- Were they all over 18, sir? I'm sorry, what? Were they all over 18, Mr. Sklar, the other co-defendants? No, I think one of them was under 18. I think that Scott Chambers at the time was under 18, if I'm not mistaken. Going to the case of Miller versus Alabama, the sentence of mandatory natural life for all those under 18, this is the holding, at the time of their crimes, even in the case of homicide offenders, is a cruelly unusual punishment. That ruling changed the law in 28 jurisdictions, including Illinois, where mandatory life sentences were imposed on juveniles. Miller followed naturally in progression from Loper versus Simmons and Graham versus Florida. Those decisions in 2005 and 2010 recognized the limited culpability of adolescents, juveniles, the unusual harshness of death and life sentences for them, and also their greater rehabilitative capacity. Now, though the court did agree that its holding still made it possible for a discretionary imposition of a natural life sentence, the court made it very clear that that would require a full hearing and evaluation of a list of factors that the court set out, including the age of the offender, the degree of participation in the crime, and the likelihood of the offender's rehabilitation. The court cautioned against this apparent relaxation of its holding with these words, and these are very important words. After all we have said, I'm quoting, in Loper, Graham, and this decision, that result should be reserved for the rare juvenile offender whose crime reflects irreparable corruption. Williams is a quintessential example of those for whom the result in Miller is intended to protect. He was 17 years old at the time of the crimes. He was sentenced to a mandatory life imprisonment without parole. He was also convicted on an accountability theory, and according to his confession, which of course we've raised some questions about,  when the murders took place. So, those kinds of conditions should clearly be considered in Williams' case, in Williams' situation. Should it be applied retroactively under Teague? That's what you're asking us to do, right? Yes. So Miller versus Alabama, the question before us today, and this is in your brief, is whether or not we should apply Miller versus Alabama to your client's case. In order to do that, this is his fifth or sixth conviction, does he have to be applied retroactively? Yes, thank you. This is exactly where I want to go. There are really three pathways, I believe, down which this court can go and end up with the result of vacating Williams' sentence and ordering a rehearing. The first pathway is to find that Teague doesn't apply at all. And I think that that is probably the most logical pathway to follow. If you look at the case, at the Miller versus Alabama case, it was decided in companion with the case of Jackson versus Hobbs, which came out of Arkansas on a habeas corpus, a state habeas corpus petition. In other words, a petition that collaterally attacked the conviction and sentence of Mr. Jackson.  Now, that either meant, unlikely, that the court was subsilentia overruling Teague. Or it was saying, we don't even think Teague's involved. This decision is so fundamental to the legal system and to the fairness of the criminal process that Teague doesn't apply. We're not even going to get into Teague. So we think that that's a strong argument and probably the best path for this court to follow, since it follows exactly from the Supreme Court of the United States. Secondly, a second path the court can follow is to find that the ruling in Miller versus Alabama fits under one of the two exceptions to Teague. And we think it does. We think it's a bit more complicated in analysis than the first pathway we suggest. But we think that the opinion in Miller versus Alabama does fit under both of the exceptions. The first exception, according to an immediately succeeding case, Pedre versus Lenoir, 492 U.S. 302 at 330, decided in 1989, a year after Teague, said that rule changes, certain rule changes that are entitled to the exception should be understood to cover rules prohibiting a certain category of punishments for a class of defendants because of their status or offense. Well, here we have a class of defendants, those under 18 years of age, and a category of punishments, mandatory life in prison. And it seems to me that that literally fits under the first exception to Teague. The second exception is a rule that requires the observance of those procedures that are implicit in the concept of an ordered society. That's Teague at page 311. And this second exception was interpreted in 2004 in the case of Shiro versus Subberlin, again a Supreme Court case, 542 U.S. 348, as being the following. Decisions that narrow the scope of a criminal statute. Such rules apply retroactively because they necessarily carry a significant risk that a defendant faces a punishment that the law cannot impose on him. Well, isn't that what's going on here? The Supreme Court has said that a life imprisonment sentence without possibility of parole cannot be imposed going forward. Is that what it says? It doesn't say without the sentencer having the ability to not have to do it. I thought reading it, they only struck down the mandatory part of it. Meaning it's still okay that juveniles get natural life, but the person sentencing must have the ability to say no. That's correct, Your Honor, but as I indicated earlier, the circumstances under which the sentence can be imposed, as suggested or directed by the Supreme Court, are very, very limited and very rare. I would suggest, Your Honor, that if you take a look at, and I know it's familiar with the case of Aldalfa Davis, People v. Aldalfa Davis, that looking at that case sets up a contrast between what the law was three years ago and what the law is today. Counsel, does the case suggest that the trial court needs to take into consideration the tender age of the defendant? Yes. Yes. That's correct. That's a pronouncement from the case as well. I'm sorry, Your Honor? That is contained in that case as well. I mean, the court must consider that it's sentencing, and was it done in this case? Well, yes, yes. The answer is yes. But as this court will remember, in Adolfo, it said that People v. Miller, which was the prior case that was considered, was essentially a one-off case, highly unusual. The circumstances were incredibly sympathetic to the defendant. It's a case which the court said was so one-off that they weren't going to use it and apply it retroactively. It was, if anything, a very, very, very, very narrow exception to the mandatory sentencing law in Illinois. Well, actually, right. On that, having, as you point out, written Davis, the panel we wrote at the time, it is the opinion of this panel of the appellate court that if there was ever a case that should be applied to cases on collateral review, even though it does not meet the requirements of Teague, People v. Miller, the Illinois case, is that case. We couldn't have made it clearer. We were hoping the Supreme Court would agree with that. They would take Davis, agree, and then say, because there's a very limited number of people doing natural life who are juveniles when they were, at the time the offense was forced, they were convicted. And they chose not to. Now, again, we work for those guys. I can't criticize them, but this is different, though. The Miller v. Alabama, nobody doing natural life under a mandatory statute had the ability to try and get around that. That's correct. So it is, I, so. That is correct. The point, though, is, the point is this, that what Miller v. Alabama did is a complete 180 degree turnaround from the state of the law in Illinois in 2009. What became, if you will, a very, very narrow exception, illustrated by People v. Miller, the Illinois decision, has now become the law of the land as a result of Miller v. Alabama. And what was the predominant law of the land, that is to say, that mandatory sentencing of juveniles was presumed to be correct, has now become the rare exception. If that's not a fundamental material change in the legal structure, I don't know what is. And it seems to me that that is the kind of, that that's the kind of decision that should fall under at least one, if not both, of the exceptions to Teague. Sir, I'd like you to have five minutes for your rebuttal. So could you conclude, please? Yes, I will. Can I ask one more question? OK. Lastly, with respect to that point, if you look at all of the decisions cited by the state where Teague was applied, they consist largely of modifications of existing criminal judicial procedures. They're tweakings, if you will. Some are more than tweakings, but they're essentially modifications of existing rules having to do with how trials are handled. They have to do with evidence, admission of evidence, presumptions about juries, how juries are selected, issues with respect to what matters are decided by judges and what matters are decided by juries. These are the kind of changes which arguably should not be applied retroactively. One could understand the rationale of Teague. Instead, with Miller v. Alabama, we have a decision that emerges from something that transcends judicial process. It comes from a scientific understanding of adolescent brain development and psychology. It's something that really goes back to the fundamentals of human knowledge and human understanding. And that, I think it's important to note. It's important to note the source of the rule in determining whether or not it's a substantive or procedural rule. Counsel, quickly, may I ask you, on the 09 decision by the appellate court in this case, do you agree with the state that the petitioner states a cause of action for actual innocence? Do you agree with that? Yes. OK. What is this court supposed to do with that finding of the appellate court? Well, I would like the court to say that that's the law of the case. And for that reason alone, reverse the trial court and send this matter to a hearing. We're not asking the court this morning to find that Williams is innocent, or that he's actually innocent, or any of his other claims. All we're asking the court to do is to give him a chance to go to a hearing where his affiance can be examined under oath and the truth of their affidavits tested. And if the state wants to bring in the statements of the co-defendants to contradict them, that's fine. That's what a hearing should be about. It seems to me that this case cries out for a hearing where the contest of truth and non-truth are placed before the trial of fact and a decision made. Counsel, are you asking for both sending back for a third stage hearing and for a resentencing? No, Your Honor. Well, you'd ask that in the alternative, wouldn't you? Yeah, that's the alternative. If we send him back and they lose. Right. That's correct. I made the, I filed a fourth petition to preserve that issue so that we didn't face a claim of race judicata or waiver at a later point in time. Thank you. Thank you, Mr. Sklar. Ms. Needham. May it please the Court. There are so many reasons that defendant's third petition was correctly dismissed. And they're all set forth in our brief. This morning, I would just like to address my comments toward the bottom line, and that is defendant does not make a substantial showing on actual innocence or any of the other claims in the third petition. Every single one of his claims is positively rebutted by the record. Defendant's affiants state that defendant is the wrong Carl, but we know we have the right Carl because defendant confessed twice after being advised of his Miranda rights. He made oral statements to ASA-GRAPSIS that were later reduced to a 10-page written confession. Defendant signed every single page of that confession. He identified his co-defendants in Polaroid photographs and signed them. He identified the victim's state ID. He made corrections and initialed the statements. Counsel, should we ignore the conclusion of the appellate court in 09 that said that his third post-conviction should be considered on its merits? What do we do with that statement? Ignore it? No, we don't ignore it, but we place it in the context of the question that was raised before that court. And the question was, this is prior to Ortiz, did defendant, the argument was, did he make a, because he had already raised a claim of actual innocence, could he proceed again on a claim of actual innocence when it was possibly barred by race judicata? Basically, whether the cause and prejudice test applied. And the court found we don't have to apply the cause and prejudice test because we are looking at whether a defendant can advance, whether that claim can be considered at all. Okay, but that's the only holding in that case, then? The question was where the posture of the petition was. The petition wasn't filed yet. So the appellate court wasn't considering whether the defendant made a substantial showing of actual innocence to go to an evidentiary hearing. It was whether there was a claim sufficient enough to proceed past the denial of leave to file stage. That was the posture of the case at that time? That is correct. The trial court had denied defendant leave to file his third post-conviction petition. You go on some length, Ms. Needham, at page 22, et cetera, of your brief, saying mainly about the co-defendant statements implicating Mr. Carl Williams, as opposed to, did they ever, anybody ever point the finger at Carl Williams other than the police when he confessed? And he did confess. And say that's the right guy, meaning a co-defendant. The state flipped one of the co-defendants. Correct, Johnson. For a lower sentence. When he testified, he didn't testify, the state didn't call him against Carl Williams at Carl Williams' trial, did they? No, that's correct. And again, there's a thousand reasons why you could do that. Right. It's helpful when they do that. We'd be in a much better position today had somebody pointed at Carl from the stand and said, and that's the guy that was with me when we did these horrible acts. Well, we had Carl pointing the finger at himself because his statements were voluntarily given. There was a finding of that that he has repeatedly forfeited. So in that instance, there really wasn't any more need to call another person. There was a time, decades, where I would completely agree with you, Ms. Needham, based on personal experience that people don't falsely confess to heinous murders. That was true, though, until DNA came forward and then you show that, including the state, can show that some of these are false. Why somebody would falsely confess to raping and murdering people, I still have no idea, but they do. And it's just a fact of life, a fact of jurisprudence that people do falsely say that they did terrible acts when they're lying about it. It happens a lot. It happens. The question in this case, is this one of those cases? No, absolutely not. You can look at the record. You said the record. So what do we have in the record? Okay. Other than his confession. Agreed his confession voluntarily, it's been ruled on three times, he voluntarily said these things. He did. Now what do you have? In addition to the confession. Well, not only in addition to the confession. We have his statements at the hearing motion to suppress about how this statement occurred. But that's not trial testimony, counsel. It's not trial testimony? Was it admitted at trial? No. Okay. Who testified at trial? Who testified at trial? ASA Grapsis. Okay. Detective Turner. Yeah. And that was it. Right. I don't know what more would be needed. But even going back, right, well, you didn't then, but you may now. That's what we're here for. Going back to what you have in your brief, you talked about co-defendants in various states. None of those in your statements do they identify. And the other guy, Carl Williams, the guy in that lock up next to me is the guy that was with us. They just refer to a guy. None of them apparently knew. I know a guy named Carl was in the backseat of the car. We decided to go out and rape, murder everybody we met. We went out and raped, murdered everybody we met. Carl was there. I don't know his name. Well, they identified his photograph. They identified his photograph when? After his photograph was taken when he came to the station. Correct. And what evidence is there in this record that indicates that the co-defendants were shown a photograph of this man, Carl Williams, that that's the Carl I confessed to or confessed about, who came with us on this murderous spree? Yeah, that's not there. Right. Right. And if we were to send it back, your argument would be that it could be. Let me put it this way. From what you know, if we were to send it back for a hearing, would there be statements? You talk about impeaching the co-defendants with their prior statements. There would be no impeachment of these co-defendants as to whether or not this Carl is the Carl that accompanied them on this. Well, there would definitely be impeachment that they told police officers, oh, you have the wrong Carl, and, oh, I gave a description of Carl as being 6'3", light-skinned and long hair. You couldn't. Yes. Assuming these police officers are still alive, and I have no idea if Charles is a real case, you would be able to think that the police would deny that the co-defendants said those things. But, again, in this case, there was no evidentiary hearing, so the state was unable to call these officers in to say, you know, liar, liar, pants on fire, the co-defendants, these murdering rapists are lying to you, Judge, when they say in their affidavits, he's the wrong Carl. They never told us he's the wrong Carl. No, but what you do have in the record is Hamlin and Chambers cooperating immediately upon their arrest, saying this is what we were doing. Hamlin is going, we know Carl, we know the area where he lives, and Hamlin is going around finding people, and then they find another witness who is not. McGee, or a guy named McGee. Right, Clayton Taylor. Is in the back seat of a car with the proceeds from the murder and robbery rape. Right. And he rolls over and Carl. But he says, per the reports and per the court's opinion, he says, I don't know if the Carl I know, who lives near where the person you should be looking for is, I have no idea if he did that or not. He's involved in this murder. Right. Right, but he fits this physical description. Well, how many Carl's live at, wherever this would be, 80th and Parnell or whatever it would be. It's a pretty common name, last time I looked. It's also in the record that the description that was provided was an African American male, 5'8", 155 to 160 pounds. That is in the record. Right. So they are. How many Carl's 5'8", 5'10", 155 pounds you think live within a few blocks of this Carl? Well, I wouldn't. It's a mighty thin thread. Would you say it's less than DNA? I would say it's less than DNA. Less than a fingerprint. Less than any kind of blood work. He's a Carl who lives in the general area. Fitting the description of the offender who participated in these events, Annie confessed at length in excruciating detail. Is there any physical evidence that ties him to any of these crimes? Physical evidence, no. With regard also, I would like to comment briefly on this defendant's argument that Hamlin and Chambers provided a, their affidavits say that they provided statements of a different description. Actually, their 2003 affidavits, Hamlin says, Hamlin said, I agreed or stipulated to the description of a 6'1"-6'3"-offender that Detective Turner provided to me. Before, not to cut you off, this goes back to where I was bringing up things with Mr. Sklar. The bottom line is this is still, while this is a third stage, no evidentiary hearing was provided. Therefore, Judge Patron was obligated to believe those affidavits, no matter, unless they're bizarre. Unless they're, no, unless they're rebutted by the record. And what part of the record contradicts them that says, when they say in their statement, that the police showed me a picture of this Carl Williams, and I said, that's the wrong Carl. That's not the Carl that was with me that night. What in the record contradicts that statement? Well, the circumstances. Not that, I know, well, you got me. That nothing in the record, because that wasn't raised until later. But what you have prior to that, and I, which we believe rebuts those claims, is they were cooperating. They provided a physical description that matches defendant. It's, they also provided, this is, we know the area where defendant's girlfriend lives. Three, two offenders implicating themselves in it. There's that reliability. Oh, they did it. Thank God they're in prison until they die. That's a good thing. But in any event, the question is whether defendant has made a substantial showing, whether these affidavits make a substantial showing. And it has to be considered in light of the record. But taking them as true. Taking them as true. How is it not a substantial showing? I think you have a better argument to raise judicata. Because I don't see the difference between the 04 public court, what they had in front of us then, and the 09. I don't see any difference. But this court, the same Justice Gallagher, had 04, shut it down, and 09 said give them a lawyer. Well, on the actual innocence claim. Right. Right. On the actual innocence claim. Not the, if you read the decision, they weren't really reaching all the Brady, the probable cause claim. On the actual innocence claim. But again, we affirmed a summary dismissal. Correct. First stage. So there's really, I suggest to you, my way of thinking, there's not, there's hardly anything new from 09 to 04. And yet, in 04, this court said, summary dismissal, it's not even close. And then in 09, well, let's get him a lawyer and let's have him, not a hearing, but let's get him a lawyer. Well, he had a lawyer. Okay. We did, yes. Right. Judge Petrone did. A little, well, he had the same lawyer on appeal for the third post-conviction. Correct. And on appeal from the denial of leave to file that third petition. And what was different, I agree, and as we've argued in our brief, it is barred by res judicata. And if law of the case applies to this substantial showing, then we should be going back to law of the case, because there was already findings on res judicata. And on actually all of defendant's claims, probable cause, coerced confession. But to do that, to agree with you on that, wouldn't we have to disagree with this court's ruling in 2009, where we said not a do-over, but go back? They appear to be completely inconsistent to me. So in terms of law of the case. Well, they're different questions. When we flip, it's kind of hard. Right. I agree. And also, I mean, our position would be that, you know, the reason law of the case for the actual innocence doesn't apply is because the question presented is different. It's not the same issue that was discussed. So it's all going to be res judicata. Doesn't that suggest it's the same facts when you're talking about res judicata? We're looking at different facts on these affidavits. Well, res judicata with respect to which claim? Because res judicata would not apply to the actual innocence claim. Right, but to the other claims. The other claims. Yes. Res judicata. The same facts. Well, unfortunately, what was different about the third post-conviction petition was the defendant was armed with the trial court's and the appellate court's comments about all the shortcomings that were in the petition. And they went back and redid them. So, and the court found Well, when we put in procedural bars, that's what they need to do. When we say, ah, you didn't sign the affidavit, get out. And we do this. It's a, for the last year, I don't know why we're doing it. I don't think I've read one saying that somebody failed to sign an affidavit and it goes back to square one. That's absurd. But then they go back and, no, I'll go get it notarized. They get it notarized and now we're back. Well, that's a little different. Did you have anything else you wanted to say? Well, I just want to point out with regard to these Brady claims about the description, is that the Chambers and Hamlin's first affidavits say that they got the information. Well, Chambers is completely, he doesn't say where he got the information. He just says, it was mentioned that the, that the car was this 6163. And Hamlin actually says, oh, I agreed with Detective Turner who told me that was a description. But then in their second affidavits, they state that, oh, no, they told the detectives of this description of another offender. And does that make a substantial showing? Our position is that it doesn't. For these reasons and all the reasons in our brief, we would ask that you affirm the trial court's dismissal of the third post conviction. Good morning again, Your Honors. You have about five minutes. I think I can discuss it. Good. Again, Assistant. We'll let you go a little further, but don't push it. Thank you, Your Honor. Assistant State Attorney Alan Spellberg on behalf of the people. As Mr. Sklar pointed out, he maintains that the Miller v. Alabama decision applies retroactively just as a matter of course to all defendants across the country who were under 18 at the time of their sentencing, at the time of their offense, and were sentenced to a mandatory natural life. And the primary reason which he offered to this court was that the decision itself applied it to the companion case of Control Jackson v. Arkansas. I would acknowledge, of course, that that did occur in that case, but you cannot read anything into that. Because importantly, if you read the opinion carefully of Miller v. Alabama, you will see that the Arkansas authorities did not argue in any way, shape, or form any question of retroactivity. You will also see that there is no discussion at all of retroactivity within the Miller v. Alabama opinion. Why would you want to fight it, though? It's more of a policy question, but since you're a supervisor, since I'm a judge, I can ask the question. Certainly you wouldn't want to be in a position, Mr. Spellberg, as your career prosecutor of arguing that if we had a death penalty, we should kill retarded people, even though they're violent, kill many people. The U.S. Supreme Court has said you can't do it, but they've never ruled that it was to be applied retroactively, correct? Right. And yet, would you feel comfortable arguing, say you got a job in Alabama in front of the U.S. Supreme Court, saying, you know what, we should be able to kill retarded people because this guy got sentenced to death before he decided that we couldn't kill retarded people? Well, Your Honor, that actually gets exactly to the next point, which I was going to say, and that shows exactly why the Teague analysis is so important and has to be engaged in. It wasn't engaged at all in the Miller decision, and you can't read anything into the silence of the courts. Just because an issue is lurking in the record, you shouldn't assume that you have to wait for the court to actually hold it's retroactive. And the mechanism we use for deciding whether or not something is retroactive is the Teague analysis. And what Teague says under the two different prongs, the first one, is it a substantive rule? Is it a categorical prohibition against something? In the example that you offered, the Atkins decision of no death penalty for persons who are mentally retarded, that was a categorical decision. Roper versus Kentucky was a categorical decision. It prohibited the imposition of the death penalty for people under 18. But in Miller, the court was extraordinarily clear that they were not imposing a categorical decision. And what they said, in particular, is our decision does not categorically bar a penalty for a class of offenders or a type of crime, as, for example, as we did in Roper or Graham. Instead, it mandates only that a sentencer follow a certain process, considering an offender's youth and attendant circumstances before imposing a particular penalty. The court stated that in the opinion to clarify that they were not talking about the categorical ban. Just as our Supreme Court said in their people versus Miller, which is a different Miller than the other murderer from down south. But the question, it goes to policy. Why? Isn't there some sense of, and I don't mean this in any way to insult anybody, what is it at all remotely fair to say that going forward, that the 17-year-olds who are out there today murdering people, and there's plenty of them out there, that they don't have to get natural life if they commit a double murder. The judges, the sentencers, well, in this case, judges, since we don't have a death penalty, have the ability to not give natural life. But we don't want to apply that same additional proceeding, and it's all it is, it's an additional proceeding to those 17-year-old murderers who committed the crimes, you know, years ago. Well, as you say, Your Honor, it is a question of policy, and what the U.S. Supreme Court identified was the basis of that policy was the necessity of respecting the finality of judgment. In Teague, they said... Over what, though? I agree with that. I really do believe in that. But over what? How hard is it to sentence this? Does that stay with Mr. Williams? How hard would it be to answer, already on a sentencing case on Mr. Williams' case? Well, Your Honor, I don't believe policy questions are identified on an individual case basis. The question of the retroactive application is a macro question. It's one of should we allow, does our system allow us to go backwards and redo from the start because we've now taken a new view of the way certain procedures should be applied? And what's the argument against that, counsel, now that we have the new view, the maybe enlightened view to some? What's wrong with applying it retroactively? Well, because exactly what the Court said in Teague and what our Supreme Court stated in Flowers is that when a decision is final, when a judgment has been rendered and is no longer subject to direct review, that it's the limited judicial resources, the limited resources that are available, it's improper to go back and say, well, maybe we could have done this better if we used the modern view. May I ask, do you have any idea how many prisoners are sitting now that would qualify? It's not entirely clear. And a big part of the reason why it's not clear is because under the prior People v. Leon Miller decision, which addressed juvenile defendants who were subject to automatic transfer, this decision applies to everyone who's under 18. And so here in Illinois, as you know, we've always treated people who are 17, like this defendant, to be adults. So they were not tracked in the same way. It's our best estimate as of this point that within the State of Illinois, there's about 100 or so, 105 maybe, but we're not entirely certain on that point. And should we consider that, whether it's yours or not? So you're very familiar with retroactivity. You've argued it many times. I've discussed it with you in the past many times. So our Supreme Court in Reddick held back in the early 80s, the legislature decided to adopt something called second-degree murder rather than voluntary. And the question then became, well, what about all those poor guys doing voluntary time? Are they in limbo like Catholics who were on the baptized bed? No. Are they entitled to a new trial? And the question was, initially, the legislature said, absolutely they are, by golly. And then they found out it's many hundreds of guys. And they came back to them with a case called Reddick. They were saying, oops, we didn't mean that guys who were convicted of voluntary rights to a trial were not going to apply whatever the name of the case before Reddick was backwards, because they couldn't, and it would be a disaster. I suggest to you, Mr. Spilberg, that 100, 105, that's bad. That's an IDOC. Let's assume that the way Cook County works is you have roughly 40% of the defendants. I assume it's probably higher for juveniles just the way life works. So you'd have 40 here. Cook County courts are always, we have, oh, we have 100, well, 70 felony trial courtrooms. I think each court could take one of these people and decide whether they deserve their natural life or not without putting too much of a burden. And understanding, I don't mean to make light of it, because the victims' families will have to be there, again, for all of this. The defendants' families who were not responsible for the acts of these heinous people will have to be put through the grease of this horrible, scab-torn open. But it's not that hard. I don't know for what editorial comment. Thank you, Your Honor. But again, as I would say, I mean, those were the policy decisions that were made by the United States Supreme Court, that were made by the Illinois Supreme Court when they adapted the Teague framework. Those policy decisions say that any new rule of criminal procedure can only be applied retroactively if it meets either of the two Teague standards. What about the second standard, though? The second standard, Your Honor, is certainly that's the only one that could be applied here, because the first one would be a rule of substance, which this doesn't fall under. The second standard, as the U.S. Supreme Court has identified and the Illinois Supreme Court has agreed, is limited to those watershed-type rules of criminal procedure, those rules which alter our fundamental understanding of the criminal process and the quintessential example, in fact, the only example to have ever been identified as being appropriate under that is Gideon v. Wainwright. And the reason why that's such a signal decision is because Gideon, by allowing, by ensuring that defendants have appointed counsel, guaranteed that the entire process from start to finish was proper. An attorney can help his client prior to arraignment, at arraignment, all the way through sentencing. In fact, the absence of an attorney during those stages renders the entire proceedings unfair and incomplete. This is a very different scenario. This is a scenario where the certain evidence was not, under the rule that exists before, was not available to be presented regarding sentencing. Instead, the judge would be imposing mandatory sentencing. It is not a question of the fairness of the trial, of the conviction, or even of the ---- Isn't somebody's freedom an important consideration here, counsel, for the rest of one's life? That wouldn't rise to that level? Certainly, Your Honor, it does. But the reason why it doesn't rise to the level is because the United States Supreme Court, in death penalty cases, has said that similar rules don't rise to that level. One of the cases that I know that we've cited is Beard v. Banks, where in Beard there was a question as to whether or not a prior ruling regarding the availability of presenting certain mitigating evidence to preclude the death penalty, whether or not that should be applied retroactively, because under the state law at the time, certain evidence was not available, and the United States Supreme Court said that it had to be presented, and then in Beard they were faced with should they construe their decision retroactively, and what the court said was, no, it's not a Gideon-type case. It doesn't reach that level. Simply because it's an Eighth Amendment basis, simply because it makes the imposition of the death penalty more fair, isn't enough to say that it should be applied retroactively. And so, again, that's quite similar to what we have here, because the U.S. Supreme Court in Miller said we can still impose natural life sentences upon these defendants. It just has to provide additional mitigating evidence, the opportunity for additional mitigating evidence. Certainly that will make sentencing hearings going forward more fair, but it doesn't mean that the prior ones were inherently unfair or unlawful or unconstitutional. But they'd be less fair, right? If the ones going forward with this additional hearing are more fair than the ones without it, it will be less fair. Well, Your Honor, and I would say that's exactly the same argument that was made in De La Paz, the retroactivity of the Apprendi cases. Again, that was a situation which I know my opponent has identified as just simply deciding who decides whether it's a judge or jury, but it was so much more than that, because that was a decision whether or not a defendant had a right to have those to be decided by the trier of fact at the trier or simply by under a reasonable doubt standard or by the judge of the sentencing under really no evidentiary standard at all. And what the Illinois Supreme Court said in De La Paz is that is not a Gideon type. It doesn't satisfy the second prong of Teague. In the Adolfo Davis decision, this Court noted with the De La Paz decision and recognized that that was a significant indication as to why cases shouldn't be deemed retroactive. I would also point to the United States Supreme Court decision in Schiro v. Summerlin, which my opponent referenced, too. That was a decision whether or not Ring v. Arizona, whether or not the decision to find a defendant eligible for the death penalty had to be made by the jury as opposed to the judge. And that was what the United States Supreme Court said was no, Ring v. Arizona was not retroactively applicable, even though those death penalties, which had been imposed, had been decided solely by a judge in clear violation of the Sixth Amendment. Counsel, Illinois, one is considered to be an adult when they're 18, is that correct? Legal capacity, the age of legal capacity, is it 18? In different situations in the criminal courts, obviously, we treat 17-year-olds as adults. I understand that. For making a contract, though, for voting, for many other things, it's 18 years of age, right? Yes. But we will allow someone 17 years of age to be convicted without consideration of their age to natural life in prison. That's a policy question that the legislature had made, which they were certainly within their authority. The constitutionality of the age of transfer has been upheld at various times. I understand that, but I'm talking about the sentence. I understand what you're saying, Your Honor, but the case law that existed prior to Miller v. Alabama, in fact, in this case itself, had upheld the validity of the sentence, that there was nothing unconstitutional about imposing a mandatory natural life sentence upon a defendant who was 17 years old at the time of the offense. That's what the case law had held. And so this new decision from Miller v. Alabama has dramatically changed the legal landscape, but that doesn't mean that this new landscape applies retroactively. And so for that reason, we'd ask this Court to affirm the denial of leave to file the fourth post-conviction petition in this case. Thank you. Thank you. Mr. Sklar. Five minutes, sir. Thank you. That's it. Very quickly, Your Honor, with respect to the third petition argument itself, the description that is in the record of a 5'8 or 5'7 black male came from Larry McGee as he was driving with Detective Turner to arrest Carl Williams, a man who he knew, admittedly. So it's not surprising that Detective Turner would be able to describe the man they were going out to arrest. With respect to the, what should I say, inconsistencies or ambiguities between the 2003 affidavits from Hamlin and Chambers and their 2007 affidavits, you have to understand that the 2003 affidavits were done pro se by those fellows. And even in the 2007 affidavit from Mr. Hamlin, he insisted on writing it himself in his own words, as he said in his affidavit. And so you've got to give, I think, some leeway to these fellows who are essentially not even high school graduates necessarily, uneducated and have spent the last, by that time, 10, 12 years in prison. So you can, I think, excuse an occasional slip between one set of affidavits and the other. And the reason why the court in 2009 found that these were new evidence is because they addressed the cause and prejudice questions from Hamlin and Chambers that hadn't been addressed in the 2003 affidavits, and which was the reason, the principal reason, I believe, why they were dismissed originally by Judge Gorn, who was the trial judge. With respect to Miller v. Alabama, what I didn't mention before was Illinois' voidness principle, which basically states under State v. Brown, and cited in our brief, that a penalty or punishment which violates the Constitution is void ab initio. Now, whether you want to go back to 1996 when the penalty was imposed, or simply look at the situation today in 2012 when Miller v. Alabama was decided, the punishment of mandatory life in prison has been outlawed and declared unconstitutional. And what we have now is Carl Williams sitting in prison, and if this court affirms the trial court and dismisses, agrees that the third petition should be dismissed, and that remains the ultimate result, Carl Williams is going to sit in prison for another 20, 30, 40, maybe even 50 years, well into the mid-21st century, serving a sentence which the Supreme Court of the United States in 2012 declared was unconstitutional. And that just does not seem right to me. And I think the court should consider that. Thank you very much. Thank you, counsels. Your oral arguments were very much appreciated by the court and will be considered. This matter is now placed under advisement. The court is adjourned. Thank you.